[Sac. No. 5638. In Bank. July 5, 1944.]

L. M. RIBLE, Appellant, v. CHARLES C. HUGHES, as Superintendent of Schools, etc., et al., Respondents.

Anthony J. Kennedy and Carl Kuchman for Appellant.

Ray C. Eberhard, Robert A. Odell and Elisabeth Eberhard Zeigler as Amici Curiae on behalf of Appellant.

Otis D. Babcock, District Attorney, John Quincy Brown, District Attorney, and William A. Green, Assistant District Attorney, for Respondents.

J. H. O'Connor, County Counsel (Los Angeles), and Beach

Vasey, Deputy County Counsel, as Amici Curiae on behalf of Respondents.

EDMONDS, J.—The Teacher's Salary Schedules of the Sacramento City Schools, effective in 1935, provide that each year, in establishing the salaries of a permanent teacher, the amount payable to him for the ensuing twelve months shall be less than his compensation for the prior school term if he does not maintain his professional efficiency by graduate study. Lilly May Rible, a teacher subject to the schedule, refused to take any course of instruction and her salary was fixed at the amount specified for those who do not comply with the requirement. Thereafter she sought by writ of mandate to compel the payment of the amount to which she would be entitled had she earned additional educational credits, and her appeal is from a judgment adverse to her contentions.

Miss Rible graduated from Stanford University in 1912 and since that year has been a teacher of English in the Sacramento Senior High School. After nine years of service, she was classified as a permanent teacher and in 1932 she received a life diploma, authorizing her to teach English in the public high schools of California. That diploma is in full force and effect and no proceedings have been taken to suspend, reduce or transfer her. (Sch. Code, § 5.650 et seq.) In summer recesses commencing in 1929, Miss Rible traveled abroad, doing research work and collecting data pertaining to English literature. By her travels she accumulated, in accordance with the Rules of the Board of Education of the City of Sacramento in effect until 1935, 40 or 50 "rating credits."

During the school year 1933-34 the Board of Education of the City of Sacramento directed its conference bureau, composed of executives of the school department, to study, for the purpose of revision, the existing salary schedules of certificated employees of the Sacramento city schools. After considerable investigation, the conference bureau reached the conclusion that new schedules, based upon certain stated principles, should be adopted. It was agreed that salaries of elementary and high school teachers should be on a basis definitely to encourage additional training. In place of automatic advances in salary it was decided that increased compensation should be uniformly granted upon an evaluation

of initial training, teaching experience, and additional professional study obtained by regular attendance at an institution of four-year college rank accredited by the State Department of Education. The conference also declared that teachers reaching the maximum salary should be stimulated to maintain their professional proficiency by continued training, and for the purpose of making this effective, it provided for a salary penalty to be imposed upon those failing to do so within a reasonable length of time.

The principles stated by the conference bureau were approved by the board of education and, in the main, were acceptable to representatives of the various teacher groups with whom they were discussed. Accordingly, a new salary schedule interpreting this ''practical philosophy'' of the teaching profession was promulgated. A minimum salary of $1,548 is fixed for a teacher in a senior high school. In the fifth year of service this salary is automatically increased to $1,836. If the teacher, after having been employed for five years, has completed the study requirement, he is entitled to an annual increment of $96 in each of the next five years of service. Likewise, after the tenth year, the salary is raised only if the teacher has obtained credit for six additional semester units. One who is eligible for all of the advances authorized by the schedule is entitled to $2,700 as salary for the fourteenth year of teaching. The maximum of $2,748 for the fifteenth and subsequent years is attainable only after having concluded further courses of study.

Consistently with the principles stated by the conference bureau, the salary schedule also provides that if a teacher, during the first five years of her employment as a permanent teacher, has not carried on her professional training by study in residence at an accredited institution, commencing with the sixth year ''the salary will be decreased by one annual increment each year until the condition is met, whereupon one annual increment per year shall be restored until the maximum is again reached.'' A similar condition is imposed at the end of the tenth and fourteenth years of service, and the same requirement is made for the retention of the maximum salary specified after fifteen years of service.

According to the schedules, a conditional increase in salary is allowed when ''six semester units shall have been completed in courses open to under-graduates, or four semester

units in courses open only to graduates, in an institution or institutions of four-year college rank accredited by the State Department of Education. This work must be done in residence. In conformity with this principle, the Superintendent will prepare a set of written standards against which training taken to meet the conditions for advancement on these schedules will be judged.''

On July 1, 1935, the effective date of the new schedules, Miss Rible was receiving an annual salary of $2,700. Having failed during the succeeding four school years to comply with the additional training requirement, on July 1, 1939, her salary was reduced to $2,604 and, on July 1, 1940, to $2,508. By a petition for a writ of mandate, she then demanded that the Board of Education and the Superintendent of Schools of the City of Sacramento authorize the payment of salary to her at the rate of $2,748 per year commencing July 1, 1939. This is the compensation to which she would be entitled had she met the requirement for additional training upon which the increase to that amount was conditioned. The trial court determined that the schedules are not in conflict with the provisions of the School Code fixing the qualification of a teacher in the high school nor of the rules and regulations of the State Board of Education and denied her any relief. The appeal is from that judgment.

As grounds for reversal of the judgment, the appellant urges that the conditions of the salary schedules are unreasonable, arbitrary and discriminatory. But, she asserts, conceding that the board of education did not abuse its discretion, it had no power to adopt the rules to which she takes exception for section 5.734 of the School Code requires that salaries must be uniform and based upon years of training and experience. She also contends that the rules are arbitrary and unreasonable in that they delegate to subordinates the discretion to determine the studies a teacher must pursue. And, as the school board cannot discharge her without cause because of contract and tenure rights (Sch. Code, § 5.650), it is seeking to do indirectly that which it cannot do directly. Moreover, she continues, disciplinary action for a failure to comply with the rules is inconsistent with the legal rights of a permanent teacher.

Other points presented by the appellant are that, conceding

for the purposes of argument that the conditions of the 1935 salary schedules were lawfully adopted and reasonable, there are fundamental principles of law which prevent their application to her. Miss Rible contends that her salary is governed by a contract, entered into between herself and the school board in 1921, which requires payment of a salary amounting to $2,700 a year. Under the provisions of section 5.401 of the School Code, she insists, a teacher's contract of employment is automatically renewed upon the same terms and conditions as existed for the previous year, and a bilateral contract may be modified only by mutual assent. Therefore, the appellant reasons, the automatic reduction in her salary in 1939 was a unilateral act which cannot affect the bilateral agreement by which the board promised to pay her $2,700 per year. This conclusion, she says, is supported by the statutes relating to tenure and the rules and regulations of a local school board are of no effect where inconsistent with the School Code. Because the School Code delegates to the State Board of Education the power to prescribe and determine the qualifications of teachers, it follows, she contends, that the jurisdiction is an exclusive one and the rules of the Sacramento board are void because they impose training qualifications additional to those required by the School Code or the rules of the state body.

In support of the judgment in their favor, the respondents declare that the challenged rules are not contrary to any statutory provision. In effect, they say, the rules do no more than provide that teachers shall be compensated according to their training and experience. And the respondents deny that the rules are unreasonable and arbitrary, or beyond the authority of the board to enact.

Notwithstanding Miss Rible's assertions, the controversy does not concern either the validity of her teaching credential or her tenure of position; the narrow issue is whether the board of education may each year fix the salary of all certificated employees upon the basis that those teachers who continue professional training are more qualified persons than the ones who do not do so and entitled to compensation accordingly. More particularly, the question is: may the compensation of those teachers who are unwilling or unable to progress by the completion of a course of study once in four years properly be placed at a lower amount because of their lesser worth in the educational field.

The rules and regulations of a city or county school board, in effect at the date of the making or renewal of a teacher's contract of employment, are integral parts of it. (*Kacsur* v. *Board of Trustees,* 18 Cal.2d 586 [116 P.2d 593]; *Fry* v. *Board of Education,* 17 Cal.2d 753 [112 P.2d 229]; *Abraham* v. *Sims,* 2 Cal.2d 698 [42 P.2d 1029]; *Fidler* v. *Board of Trustees,* 112 Cal.App. 296 [296 P. 912].) Miss Rible's last written agreement, executed in 1921, was designated a ''Salary Contract'' and it provided that she was elected ''under section 1609'' of the Political Code ''in accordance with salary schedule adopted by the Board.'' Under the provisions of section 1609 of the Political Code, the pertinent provisions of which are now embodied in sections 5.401 and 5.500 of the School Code, the contract of employment of a permanent teacher is automatically renewed from year to year upon the same terms unless, prior to renewal, the school board acts to change such terms. It follows, therefore, that upon the automatic renewal of Miss Rible's contract for the school year 1935-36, it was subject to the new salary schedule and rules adopted July 1, 1935, unless the board had no authority to adopt them or its acts in doing so constituted an abuse of discretion.

Section 5.731 of the School Code provides that city and county boards of education have the power to fix and order paid the compensation of school teachers. The section has been interpreted accordingly. (*Kacsur* v. *Board of Trustees, supra; Fry* v. *Board of Education, supra; Abraham* v. *Sims, supra; Fidler* v. *Board of Trustees, supra.*) In recognizing the power of a board to fix teachers' salaries under the provisions of section 5.731, the court, in the Kacsur case, reiterated ''that a permanent teacher has no vested right to a particular salary and that such salary may be changed by the administrative authority,'' subject to the qualification ''that the fixing of salaries must not be discriminatory, arbitrary or unreasonable.'' In the Fry case it was said that, ''within the limits fixed by the School Code, the Board has discretionary control over the salaries of teachers.'' A restriction upon the authority in that regard, said the court, is the legislative requirement that ''within reasonable limits, the principle of uniformity of treatment as to salary for those performing like services with like experience'' must

be observed but this limitation "does not prevent the Board from making reasonable classifications." In the Sims case, it was said that, although the Legislature intended to give teachers a permanency of tenure, it did not give any "assurance against change in salary. . . . The power of the trustees to raise or reduce the salaries of permanent teachers cannot be doubted, provided it is reasonably exercised and no attempt is made after the beginning of any particular school year to reduce the salaries for that year." According to these decisions, then, a board of education may exercise its discretion in adopting salary schedules fixing the compensation to be paid to permanent teachers although (1) the schedule must be adopted prior to the beginning of the school year; (2) any allowance based upon years of training and experience must be uniform, and subject to reasonable classification; and (3) the schedule must not be arbitrary, discriminatory or unreasonable.

In the present case, the salary schedules fix the rate of compensation in accordance with stated conditions. They apply generally to all certificated employees. At his option, a teacher may, by obtaining additional educational credits, from time to time qualify for additional salary. If he does not choose to do so, the board of education rates his worth to the school district at a lesser amount than one who enlarges his educational experience. In short, the salary schedules merely provide that a teacher is to be compensated in accordance with training and experience.

Certainly this is a desirable procedure. Miss Rible has not been singled out for particular or arbitrary action and the rules do not impose a penalty in the legal sense of that term but set up a standard of salary to be paid each year. There is no basis for the assertion that the board, by adopting the schedules, attempted to do indirectly what section 5.650 of the School Code, providing against dismissal of permanent teachers without cause, prohibited it from doing directly. The fixing of a lower salary for one who has not taken a course of study during four years is not a dismissal without cause, nor do the rules impose training requirements upon permanent teachers, in addition to those prescribed by the State Board of Education, as a condition precedent to employment.

These considerations apply with equal force to the

appellant's remaining contention that the schedules and their conditions are unreasonable, arbitrary and discriminatory. ■ If reasonable minds may well be divided as to the wisdom of an administrative board's action, its action is conclusive. Or, stated another way, if there appears to be some reasonable basis for the classification, a court will not substitute its judgment for that of the administrative body. (*Gabrielli* v. *Knickerbocker*, 12 Cal.2d 85 [82 P.2d 391]; *Monahan* v. *Department of Water and Power*, 48 Cal.App.2d 746 [120 P.2d 730].) ■ The completion of a course of study one summer out of each four has a reasonable relation to a teacher's ability to discharge his professional duties. Although such training may not benefit all teachers equally, the basis of our educational system is that study enlarges one's capacity for accomplishment and leadership in any activity. Very certainly, a permanent teacher of long service, such as Miss Rible, who so far as the record shows, during more than 30 years of school work has not been in touch with any other phase of education than her own teaching, would benefit from college study not only with respect to the specific subjects for which she received credit but also from contact with modern educational processes. The Sacramento salary schedules are based upon this self-evident fact, and the determination of the board of education that compensation should be fixed each year in accordance with an estimation of ability is a reasonable one and, therefore, conclusive upon the courts.

Nor is it true that the schedules are discriminatory in their application to the appellant. As emphasized, the difference in salary payments to permanent teachers performing the same duties is based upon a reasonable classification: that of fixing salaries upon the basis of training. ■ Although it would appear that, as Miss Rible asserts, section 5.734 of the School Code requires uniformity in any schedule of salaries making allowance for years of training and service, nevertheless, uniformity is not violated by a reasonable classification. (*Fry* v. *Board of Education, supra.*) ■ And the fact that the superintendent did not "prepare a set of written standards against which training . . . will be judged," as required by the rules annexed to the 1935 schedules (Bulletin, p. 10), but, rather, delegated to the principal of the high school the power to so determine, does not support Miss

Rible's claim that the administration of the rule was arbitrary. She did not refuse to study because no particular courses had been prescribed by the superintendent but upon the ground that she considered herself "qualified to teach, and those rules were what we might call coercion and rather foolish ones."

The judgment is affirmed.

Gibson, C. J., Traynor, J., and Schauer, J., concurred.

CARTER, J.—I dissent. I believe that the salary schedule adopted by the Sacramento School Board is discriminatory and unreasonable.

The opinion of the court in stating that appellant's teaching credentials or tenure of position is not here involved, and confining discussion of the controversy strictly to the power to adjust and reduce compensation, is entirely oblivious of the fact that the effect of such salary manipulation as here sought to be practiced, can only be to deprive the teachers of this state, of rights protected by their grant of a life diploma by the State Board of Education, and to impair rights heretofore guaranteed by the provisions of the School Code providing for the permanent tenure of teachers.

Sections 5.260 to 5.281 of the School Code provide for the granting of life diplomas, authorizing the holder to serve for life in the public schools of this state, in the capacity therein specified. Appellant, in 1932, was awarded such a life diploma, the state thereby recognizing her qualifications to teach. Sections 5.270 to 5.281 of the School Code provide for the issuance by county, or city and county boards of education, of a permanent certificate to the holder of a life diploma, upon the successful completion of the number of years of teaching prescribed therein, which entitles the holder to teach in that county or city and county during the life of the holder. The question, then, immediately presents itself, as to the value of such a life diploma, or certificate, if the teacher's salary may intermittently be diminished, by the infliction of penalties, upon failure to meet superimposed study requirements.

As to teachers' tenure, it is the declared policy of this state (Sch. Code, §§ 5.500-5.504). "The legislature has conferred upon teachers, under specified circumstances, a vested right

to be so classified and to teach as permanent instructors, in the particular district where this right has been secured.'' (*Dutart* v. *Woodward,* 99 Cal.App. 736 [279 P. 493] ; *Davis* v. *Gray,* 29 Cal.App.2d 403 [84 P.2d 534].) We are not here concerned with the soundness of that policy. (*Dutart* v. *Woodward,* 99 Cal.App. 736, 739 [279 P. 493].)

The rule making power of a local school board is limited to those rules and regulations which are reasonable, uniform in treatment, and not in conflict with existing law. (*Fry* v. *Board of Education,* 17 Cal.2d 753 [112 P.2d 229] ; *Kacsur* v. *Board of Trustees,* 18 Cal.2d 586 [116 P.2d 593] ; *Dutart* v. *Woodward, supra.*) We are justified in saying as a basic premise, that anything which would work to undermine and destroy the declared policy of tenure is unreasonable. The salary schedule here under consideration, does just that.

While the provisions of the School Code, providing for permanent tenure of teachers, guarantee to the public retention of those teachers who have demonstrated their fitness (*Hogsett* v. *Beverly Hills School Dist.,* 11 Cal.App.2d 328 [53 P.2d 1009]), such statutes also have a reciprocal purpose, looking toward benefit of the teachers, giving a measure of security to those who have served as teachers for the probationary period. (*Board of Educ. of Jersey City* v. *Wall,* 119 N.J.L. 308 [196 A. 663] ; *State ex rel. Bass* v. *Vernon Parish School Board,* (La.App.) 194 So. 74.) And it cannot be doubted, that the latter was the motivating factor in the enactment of our tenure law. Tenure, therefore, not being merely an instrument whereby a teacher may continue the enjoyment of teaching, but the basic element therein being the right to receive a compensation commensurate with the status he or she has attained by virtue of his or her years of study, preparation and past experience, thousands of teachers throughout this state have as a consequence thereof conformed their mode of living to the salary levels which they have been led to believe they were assured as an incident to their tenure status. It is true that a teacher has no vested right to a particular salary, and that such salary may be changed by administrative authority (*Kacsur* v. *Board of Trustees, supra*), but such changes must be uniform, and must have some regard to the actual classroom worth of the teacher. (*Abraham* v. *Sims,* 2 Cal.2d 698 [42 P.2d 1029] ; *Fry* v. *Board of Educ., supra; Kacsur* v. *Board of Trustees,*

*supra.*) Assuming that the additional educational experience required would have some tendency to increase the ability of an already qualified teacher (it may be here noted that the rule does not prescribe what type of courses shall be taken), by no stretch of the imagination can it be said that failure to take the additional course of study will result in such a substantial diminution in the classroom worth of the teacher, as to justify the salary deductions here contemplated. As applied to appellant, the schedule proposes to reward her, to the extent of $48 if she takes certain additional training, but if she does not take the training she is to be penalized "one annual increment," amounting to $96 each year "until the condition is met." If she does not comply with the rule for a period of twelve years, she will be reduced to a beginner's salary of $1,548. That such lot could befall one who has been given the protective status of tenure is unthinkable. In order to attain tenure, appellant met rigid qualifications, and gave the required number of years of satisfactory service, and in addition thereto has traveled extensively looking toward her professional improvement; these travels being designed to improve her subject of literature, comprising a large phase of the English courses which she teaches. As to her teaching record, the trial court expressly found that she has rendered many years of efficient, satisfactory, successful service in the Sacramento schools, including the years involved in this salary controversy.

There are many circumstances, or reasons, which may constitute good cause for not taking, or entirely preventing a teacher from taking the courses and accumulating the credits demanded, such as sickness, need of recuperation from the school year's work, necessity of caring for children, inability to transfer residence to a university center, financial reasons, etc., and thus by virtue of the demerit system employed, they will be penalized, while less efficient and less competent teachers who may take the required units of work, and still remain the least competent, will not be penalized. Even if a teacher is physically able to meet the requirements, the rule compels him or her to forego one out of every four vacation periods, the same constituting a part of that teacher's own leisure time, to fulfilling the conditions imposed.

If the objective of additional schooling be deemed desirable, in order that teachers may keep in touch with modern

processes, or for other reasons, the result could be brought about by other methods, that would not affect tenure, for example, opportunities for advancement, the granting of privileges and other like inducements, rather than by giving demerits, such as result from the substraction process here employed.

This case was originally appealed to the District Court of Appeal of the Third Appellate District and a decision was rendered by that court reversing the judgment of the trial court and directing the issuance of the writ of mandamus as prayed. The opinion in the District Court of Appeal was prepared by Presiding Justice Adams and concurred in by Justices Peek and Thompson. I am convinced that said opinion contains a correct statement of the law applicable to the facts of this case and I adopt as a part of this dissent the following portion of said opinion:

"Section 5.530 of the School Code provides that boards of school trustees and city boards of education shall have power and it shall be their duty to fix and prescribe the duties to be performed by all persons in public school service in the school district. Section 5.420 provides that they shall employ only persons holding proper credentials and certificates; section 5.730 imposes upon them the duty to fix and order paid the compensation of persons in public school service employed by them; sections 5.541-5.547 prescribe the duties of teachers; section 5.650 provides that no permanent employee of a school board shall be dismissed except for the reasons set forth therein, and sections 5.652 et seq. provide the time and method by which charges must be made and heard. There is no provision in the law for disciplinary action against a teacher short of dismissal.

"It is not contended or even suggested by respondent herein that petitioner is subject to dismissal or that it would be within the power of the board to promulgate and enforce a rule requiring that permanent teachers in its employ continue to take college courses. It is said in respondents' brief that 'the question here is not whether the district can require the petitioner to take more training as a teacher in order to hold her position, but whether or not she can be required to take more training or else suffer a reduction in salary.' Obviously, then, the board is attempting to do indirectly what

it could not do directly—that is, compel teachers to acquire additional college units by penalizing them by way of a reduction of salary if they do not. This, we believe, is in excess of the powers of the board. Inasmuch as such boards are quasi-municipal corporations of limited power, they have only special powers which may not be exceeded (23 Cal.Jur. 90; *Pasadena School District* v. *City of Pasadena,* 166 Cal. 7, 9 [134 P. 985, Ann.Cas. 1915B 1039, 48 L.R.A.N.S. 892]; *Grigsby* v. *King,* 202 Cal. 299, 304 [260 P. 789]). They are powerless to impose penalties—a purely legislative power. (*Harbor Commissioners* v. *Excelsior Redwood Co.,* 88 Cal. 491 [26 P. 375; 22 Am.St.Rep. 321]; *Gilgert* v. *Stockton Port District,* 7 Cal.2d 384, 390-391 [60 P.2d 847].) And such rules and regulations as they may be authorized to make and enforce must be reasonable and not discriminatory or oppressive, or arbitrary. (*Dutart* v. *Woodward,* 99 Cal. App. 736, 739-740 [279 P. 493]; *Chambers* v. *Davis,* 131 Cal. App. 500, 507 [22 P.2d 27]; *Lotts* v. *Board of Park Commissioners,* 13 Cal.App.2d 625 [57 P.2d 215]; *McLeod* v. *State,* 154 Miss. 468 [122 So. 737, 63 A.L.R. 1161]; *Hutton* v. *Gill,* 108 Ind.App. 1 [7 N.E.2d 1011]; *Hutton* v. *Gill,* 212 Ind. 164 [8 N.E.2d 818, 820]; *Valentine* v. *Independent School District,* 187 Iowa 555 [174 N.W. 334, 6 A.L.R. 1525]; 24 R.C.L. 575, § 23.) They can promulgate no rules in contravention of statutory provisions, nor accomplish by indirection that upon which a statute has placed a ban. (*Fairchild* v. *Board of Education,* 107 Cal. 92 [40 P. 26]; *Mitchell* v. *Winnek,* 117 Cal. 520, 527 [49 P. 579]; *Dutart* v. *Woodward, supra.*) There can be no arbitrary or unreasonable exercise by the board of its power to reduce salaries or change assignments of permanent teachers. (*Abraham* v. *Sims,* 2 Cal.2d 698, 711 [42 P.2d 1029]; *Dutart* v. *Woodward, supra.*) And classification of teachers for salary purposes must be reasonable, natural, and based upon a substantial difference germane to the subject, or upon some basis having a reasonable relation to the work assigned. (*Hutton* v. *Gill,* 212 Ind. 164 [8 N.E.2d 818, 820].)

''In the case before us the rule enforced against petitioner by the reductions of her salary ignores successful experiences and efficiency as a factor in determining salaries, in contravention of section 5.734 of the School Code; it arbitrarily assumes that a teacher becomes not more, but less efficient

with experience; that failure to take additional college work makes a teacher less competent; it also assumes arbitrarily that the taking of any six (or four) units of college work every four yers will restore efficiency (though only by degrees); it ignores rating credits acquired under the former salary schedule; it compels a teacher, at her own expense and on her own time, to leave her home and go to a college one semester each four years; it is not a rule governing the conduct of the schools under the jurisdiction of the board, but of the teacher during her vacation from school duties; it ignores every other method by which a teacher might acquire mental stimulus; and in this case it implies inefficiency in conflict with the finding of the trial court of petitioner's efficiency. It is based upon no classification of either teachers or duties, unless it be contended that teachers are to be classified as those that do and those that do not take the prescribed additional college work; and such a classification would be purely an arbitrary one not based upon qualifications or experience, and could not be justified. (*Lotts* v. *Board of Park Commissioners, supra; Mansur* v. *City of Sacramento,* 39 Cal.App.2d 426 [103 P.2d 221].)

"The rule is arbitrary also in that no basis appears for the fixing of the so-called 'annual increment' of $96 deducted from appellant's salary, no basis for the number of college units teachers are required to complete, and no basis for the requirement that such university courses be taken every four years. If six college units every four years can be required, six units each year can be required; and if a penalty of $96 per annum can be imposed for non-compliance, any other arbitrary amount could be imposed and the advantages of tenure utterly defeated. It does not prescribe what kind of courses shall be taken by teachers, but merely the number of units that must be completed; so a teacher of English, if she so desired, might present six units of hygiene or home economics, kinesiology or Coptic. Though the rules of the board provide that written standards shall be set up by the superintendent of schools to govern training conditions, it is admitted that none such were set up.

"Petitioner did not fail to perform any duty prescribed by the law or the board. It is not contended that she has not kept up to date in her methods; and except for her failure to acquire the requisite college units her salary would have

been the same as previously, $2,700. There was no change in her rank or grade, working hours or duties. The deductions were not made because of any inefficiency on her part, but as a penalty for failing to go to school. Respondents in their brief contend that there is no penalty involved; but we note that in the Bulletin issued by the board in September, 1936, it is recited: 'It was concluded that teachers reaching the maximum should be stimulated to maintain their professional proficiency by continued training. To make this effective, it was agreed that a *salary penalty* should be imposed upon those failing to do this within a reasonable length of time.' (Italics ours.)

"Also, the rule as applied to petitioner is discriminatory. The evidence shows that high school teachers of English with as little as ten years of experience were receiving $2,748 per annum, while petitioner, with twenty-nine years of successful experience, was, after the reductions, the lowest paid among such teachers. There was no general reduction of salaries, the only ones reduced being those of teachers who had not complied with the 'condition.'

"In *Kacsur* v. *Board of Education,* 18 Cal.2d 586, 592 [116 P.2d 593], the court said:

" 'However, there are limitations on the power of boards of trustees to change salaries of permanent teachers. One of the "legal consequences" referred to in the Abraham case, *supra (Abraham* v. *Sims,* 2 Cal.2d 698 [42 P.2d 1029]), is that the fixing of salaries must not be *discriminatory, arbitrary or unreasonable.* The above cited cases all so qualify the general power of the administrative agencies to fix the salaries of permanent teachers. Because of this qualification it necessarily follows that there must be a comparison with the salaries of other teachers or salaries of previous years. If this could not be done, the qualification would be meaningless.' (Italics ours.)

"The record there showed that the respondent board attempted to reduce appellants' salaries from $1,600 to $1,325, practically the minimum allowed by law. No other salaries were reduced; most of them were raised; and the salary of a teacher of approximately the same years of service, experience and qualifications remained the same. The court said:

" 'These facts standing alone are sufficient to force the conclusion that the attempted action of the board was un-

reasonable and arbitrary. The fact that the salary of a teacher of like experience and years of service was not reduced is particularly strong in support of appellants' claim of discrimination. That there must be some degree of uniformity was recently recognized by this court in the case of *Fry* v. *Board of Education,* 17 Cal.2d 753 [112 P.2d 229]), wherein it is stated at page 757; "It must be conceded that, within the limits fixed by the School Code, the Board has discretionary control over the salaries of teachers. (Citing cases.) However, it must also be conceded that the Legislature had enjoined on such Boards, with reasonable limits, the principle of uniformity of treatment as to salary for those performing like services with like experience. . . .'''

"And in that case the Supreme Court reversed the finding of the trial court that the board had not acted arbitrarily.

"We conclude that the rule of the board requiring petitioner to acquire additional college units or suffer a reduction in salary to which she was otherwise entitled was in excess of the powers of the board. The judgment is reversed and the lower court is directed to issue the writ of mandamus as prayed."

In my opinion the judgment should be reversed.

Shenk, J., and Curtis, J., concurred.

Appellant's petition for a rehearing was denied August 3, 1944. Shenk, J., Curtis, J., and Carter, J., voted for a rehearing.